NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (212) 318-3000
Telefax: (212) 318-3400
Frank A. Taylor, Esq.
Francisco Vazquez, Esq.
Julie H. Firestone, Esq. (*admitted pro hac vice*)
frank.taylor@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
julie.firestone@nortonrosefulbright.com
*Attorneys for Fidelity & Guaranty Life Insurance Company*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEON LOWENTHAL, | Case No. 19-24115 (RDD) |
| Debtor | |

**STATEMENT OF FIDELITY & GUARANTY LIFE INSURANCE COMPANY (i) IN SUPPORT OF DEBTOR LEON LOWENTHAL'S MOTION TO CONVERT CHAPTER 11 CASE TO CHAPTER 7 CASE, AND (ii) IN OPPOSITION TO CROSS-MOTION FOR AN ORDER DISMISSING THE DEBTOR'S CASE PURSUANT TO 11 U.S.C. §1112(B)**

Fidelity & Guaranty Life Insurance Company ("FGLIC") files this Statement (i) In Support of Debtor Leon Lowenthal's[1] Motion to Convert Chapter 11 Case to Chapter 7 Case, and (ii) In Opposition to Cross-Motion for an Order Dismissing Lowenthal's Case Pursuant to 11 U.S.C. §1112(b).

## PRELIMINARY STATEMENT

This case must not be dismissed. Justice requires the appointment of an independent fiduciary who can manage the claims of the many creditors, marshal the estate's assets located in

[1] Debtor Leon Lowenthal shall be referred to herein as "Lowenthal."

several states for the benefit of all creditors, and determine whether the debtor is disqualified from discharge due to his fraudulent conduct or other statutory reasons.[2] Otherwise, the victims and perpetrators of the fraud will likely file numerous competing actions in various jurisdictions, which will lead to inconsistent results, the dissipation of assets, and the waste of juridical resources.

As set forth in greater detail below, Lowenthal engaged in a massive fraudulent rebating scheme that victimized, among others, FGLIC, an insurance company, out of no less than $4,485,100.70 in commissions fraudulently obtained by Lowenthal from FGLIC.

In addition, FGLIC has asserted claims in the amount of no less than $40,321,386.78 against Lowenthal for amounts Lowenthal and others fraudulently induced FGLIC to pay all of them in commissions and bonuses for the issuance of insurance policies procured through the submission of false and fraudulent applications for life insurance submitted to FGLIC.

FGLIC has reason to believe that Lowenthal funneled the commissions and bonuses fraudulently obtained from FGLIC to purchase at least three separate properties: the $84.7 million American Metro Center in Hamilton, New Jersey; 309 Maple Avenue, Linden, New Jersey; and 370 Jackson Avenue, Scotch Plains, New Jersey (collectively, the "Real Property").

FGLIC believes certain persons have filed claims against Lowenthal in this Court and elsewhere that are either unenforceable or which they have no intention of pursuing, as evidenced by their support for the dismissal of this case and waiving any recovery under the Bankruptcy Code.

---

[2] During the meeting of creditors conducted under section 341 of the Bankruptcy Code on April 24, 2020, Lowenthal asserted his Fifth Amendment right against self-incrimination. Firestone Decl., Ex. H. Similarly, another alleged agent co-conspirator of Lowenthal's asserted his Fifth Amendment right in response to a Subpoena Duces Tecum served by FGLIC in a separate proceeding. Firestone Decl., Ex. I.

The conversion of this Chapter 11 Case to Chapter 7 and the appointment of a Trustee would be in the best interests of the creditors, the estate and the judicial system. Justice compels the appointment of a Trustee, who can administer Lowenthal's estate and pursue claims and recover assets, including the Real Property, for the benefit of all creditors. Creditors and the estate need the benefit of the automatic stay and a neutral, centralized forum to recover assets and resolve Lowenthal's debts. Otherwise, competing lawsuits will proliferate in the Eastern District of New York, the District of Maryland, New York state courts, and possibly New Jersey state and federal courts, which will deplete assets, waste judicial resources, and ultimately thwart justice, especially if such cases are later simply dismissed.[3]

Thus, FGLIC: (i) opposes the requests to dismiss Lowenthal's bankruptcy case; and (ii) supports Lowenthal's request to convert his Chapter 11 case to a Chapter 7 case.

## BACKGROUND

### A. Lowenthal Defrauded FGLIC Out of Millions of Dollars in Life Insurance Commissions and Bonuses and Used the Money to Purchase the Real Property.

1. This case is predicated upon a wide-ranging, complex, illegal and fraudulent premium financing scheme ("Lowenthal Scheme") in which:

(i) Lowenthal caused various persons, the so-called "Funders,"[4] to loan money to be used to fund premiums for the purchase of life insurance policies to be issued by FGLIC;

---

[3] Lowenthal has been a Defendant in at least two other litigations for alleged fraudulent schemes unrelated to this one: (1) *Visión en Analisis y Estrategia, et al. v. Karl Andersen, et al.*, Case No. 1:14-cv-08016-SAS (S.D.N.Y.); and (2) *John Hancock Life Insurance Company v. Samuel Z. Brown*, 3:09-cv-03453 (D. N.J.). In both instances, the cases were dismissed.

[4] These Funders include, but are not limited to, various Claimants who have filed Proofs of Claim and Adversary Complaints in the Chapter 11 Case: (i) Dr. Aharon Gutterman and Batsheva Markowitz (ECF Claim 8-1); (ii) Nachum Feintuch a/k/a Michael Feintuch (ECF Claim 9-1); (iii) Darren Singer (ECF Claim 10-1); (iv) Alan Rubenstein (ECF Claim 11-1); and (v) Rockford Holdings Group LLC, Steve Makowsky, and Joe "Yossi" Davidson (ECF Claim

(ii) Lowenthal then caused sham trusts to be created:

(a) into which the loaned funds were placed;

(b) from which the loaned funds were used to pay the premiums for the life insurance policies to be issued by FGLIC; and

(c) into which the policies issued by FGLIC were to be placed (the "Sham Trusts");

(iii) Menachem Meisner acted as the trustee for many of these Sham Trusts;

(iv) After the Sham Trusts were created, Lowenthal submitted to FGLIC:

(a) false and fraudulent life insurance applications; and

(b) premium payments that were improperly and illegally borrowed from the Funders for the sole purpose of obtaining commissions and bonuses from FGLIC by fraudulent means;

(v) FGLIC reasonably relied upon the false applications and the premium payments, and FGLIC:

(a) issued an insurance policy into the Sham Trusts; and

(b) paid, either directly or indirectly, at least 135% of the premiums to Lowenthal as commissions and bonuses; and

(vi) Lowenthal, Meisner and others, including possibly the Funders, used the ill-gotten commissions and bonuses to either:

(a) purchase the Real Property for themselves; or

(b) use a portion of the ill-gotten commissions and bonuses to pay premiums on other policies, thereby continuing the Lowenthal Scheme.

2. The Lowenthal Scheme is graphically displayed in Exhibit A to the Declaration of Julie H. Firestone (the "Firestone Decl."), which is filed contemporaneously with this paper. The exhibit is incorporated herein by this reference.

---

(Cont'd from preceding page)

12-1). The Funders have detailed their participation in the Lowenthal Scheme in their papers filed with this Court, which are incorporated herein by this reference.

3. The relationship of the various parties to the Lowenthal Scheme is further detailed in the spreadsheet that is Exhibit B to the Firestone Declaration filed contemporaneously with this paper and incorporated herein by this reference.

4. By using money loaned by the Funders and commissions and bonuses paid to FGLIC to purchase life insurance policies, Lowenthal sold "free" FGLIC life insurance policies in violation of the law and his fiduciary duties.

5. When Lowenthal used the commissions and bonuses to repay the Funders, either directly or indirectly, the money used to finance the Lowenthal Scheme, Lowenthal, the Funders and others engaged in a fraudulent and illegal practice known as "rebating."

6. By failing to disclose, *inter alia,* on the life insurance applications that the funds used to pay the premiums were borrowed, Lowenthal and possibly others submitted false and fraudulent applications to FGLIC.

7. Upon information and belief, the amounts Lowenthal swindled from FGLIC ultimately were funneled through co-conspirators to purchase the Real Property.

**B. <u>FGLIC's Business with Lowenthal</u>**

8. Until Lowenthal's license was revoked in 2018, Lowenthal was a licensed, independent insurance broker specializing in life, accident and health insurance policies.

9. FGLIC is and, at all times material hereto, was in the business of, *inter alia*, selling life insurance policies.

10. Lowenthal was an independent agent appointed by FGLIC to sell life insurance policies.

11. FGLIC relied on Lowenthal to act with honesty and integrity.

12. Lowenthal owed FGLIC fiduciary duties of, *inter alia*, good faith, fair dealing, honesty and compliance with the law.

13. On or about February 2, 2015, Lowenthal entered into an "Insurance Producer Agreement" with FGLIC, a true and correct copy of which is attached hereto as Firestone Decl., Exhibit C, whereby Lowenthal was appointed as, and agreed to act as, an agent for the purpose of selling insurance policies issued by FGLIC.

14. FGLIC relied on Lowenthal to honestly and accurately disclose all pertinent information to FGLIC regarding each insured through each life insurance application, so that FGLIC, *inter alia,* could fairly assess whether to issue life insurance policies worth millions of dollars.

15. In willful disregard of his duties, Lowenthal engaged in a massive, fraudulent premium financing scheme to swindle FGLIC:

(i) Lowenthal fraudulently misrepresented to FGLIC that he was submitting legitimate and proper applications for the sale of life insurance policies, when, in fact, he was not;

(ii) Lowenthal intentionally submitted false and fraudulent life insurance applications to FGLIC through the mail and wire, upon which fraudulent applications FGLIC relied in issuing the policies;

(iii) The applications were false and fraudulent in several respects, including, but not limited to: (a) misrepresenting the identity of the person who would act as trustee of the policy; and (b) misrepresenting that the premiums used to purchase each policy were not borrowed from others, which representation turned out to be false when made. Indeed the very papers submitted by Claimants in their Proofs of Claim filed at ECF Claim 8-1 through Claim 12-1 establish the fraud;

(iv) As established by the papers and dealings filed by Claimants Dr. Aharon Gutterman and Batsheva Markowitz; Nachum Feintuch a/k/a Michael Feintuch; Darren Singer; Alan Rubenstein; and Rockford Holdings Group LLC, Steve Makowsky, and Joe "Yossi" Davidson, the premiums used to purchase the life insurance policies issued by FGLIC were, in fact, funded by persons other than the insureds (*i.e.*, the Funders), meaning that the insureds did not pay for the policies issued by FGLIC, in violation of, among other things, Lowenthal's fiduciary duties owed to FGLIC and

applicable nonbankruptcy law, including New Jersey's anti-rebating statute, N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13;[5]

(v) Lowenthal sold "free" FGLIC life insurance policies to insureds, by funding the first-year insurance premiums through sham "loans" obtained from the Funders in violation of the law and his fiduciary duties and through fraudulent means;

(vi) Lowenthal and others, including the Funders, collected commissions and bonuses from FGLIC totaling up to 155% of the first-year premiums paid by FGLIC on the life insurance policies that were procured through fraud;

(vii) Lowenthal used the commissions and bonuses to repay the Funders—a fraudulent and illegal practice known as "rebating";

(viii) In violation of the law, fiduciary duties and through fraud, Lowenthal and the co-conspirators pocketed the difference between the commissions and bonuses paid by FGLIC and the first-year premiums paid to FGLIC as the profits of the Lowenthal Scheme.

**C. Lowenthal Sold R.G.[6] a FGLIC Policy as Part of the Scheme**

16. Lowenthal sold to R.G., a New Jersey resident, a FGLIC life insurance policy valued at $4.75 million, which was procured by fraud and breaches of fiduciary duty.[7]

17. In July 2016, Lowenthal completed a FGLIC life insurance application for R.G. (the "R.G. Application"), which redacted R.G. Application is attached hereto as Firestone Decl., Exhibit D and incorporated herein by this reference.

18. In the R.G. Application, Lowenthal identified the trustee of the policy as E.B. *Id.*, Exhibit D.

---

[5] The life insurance policies in question were issued in the State of New Jersey.

[6] Names of insureds and trustees that are not already in the public record through previous filings in this case are being redacted to initials only, for privacy purposes.

[7] FGLIC has reason to believe that R.G. is Claimant Dr. Aharon Gutterman's mother.

19. The R.G. Application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"

20. Lowenthal falsely answered this question "NO" in the Application.

21. On or about July 28, 2016, Lowenthal executed the R.G. Application, certifying falsely that R.G. was not using funds from a third party in order to pay the insurance premium.

22. Upon information and belief, Lowenthal knew this representation was false when made because he knew R.G. was paying the premium with funds from a co-conspirator.

23. Lowenthal concealed from FGLIC the fact that R.G. was paying the premiums with funds from a co-conspirator to induce FGLIC to issue the policy to R.G.

24. Upon information and belief, Lowenthal also fraudulently concealed from FGLIC the fact that the R.G. Application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the R.G. policy's first-year premium.

25. Lowenthal's false statements in connection with the R.G. Application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

26. Using the mail and wire, Lowenthal delivered the fraudulent application to FGLIC on or about July 28, 2016.

27. In reliance on Lowenthal's misrepresentations, FGLIC issued a life insurance policy to R.G. with a value of $4.75 million, and an effective date of September 1, 2016.

28. Moreover, the R.G. Family Trust disclosed that E.B. was the Trustee. A true and correct copy of the Trust is attached hereto as Firestone Decl., Exhibit E and is incorporated herein by this reference.

29. In reality, Menachem Meisner acted as Trustee and wired the funds to pay the premium from the Trust. Firestone Decl., Exhibit F.

30. On or about September 14 and 29, 2016, Menachem Meisner, acting as purported trustee for the R.G. Family Trust, wired two payments to FGLIC totaling $917,700 for the first-year premium for R.G.'s policy. Firestone Decl., Exhibit F.

31. Menachem Meisner, therefore, was acting as trustee for the policy, rather than E.B., as Lowenthal represented in the policy application.

32. Upon information and belief, the Funders funneled money, through a sham transaction, to R.G. or The R.G. 2016 Family Trust to fund the premium payments.

33. In reliance on Lowenthal's fraud, FGLIC paid Lowenthal, directly or indirectly, commissions and bonuses of approximately $1.15 million for the fraudulent sale of the R.G. policy.

34. Upon information and belief, Lowenthal paid the commission and bonus payments to the Funders to repay the sham loans that had funded the premiums and to Menachem Meisner to purchase the Real Property.

35. Specifically, upon information and belief, on September 21, 2016, September 22, 2016, and October 3, 2016, Lowenthal made three payments totaling $1,061,000 to Funder Menachem Meisner and/or his company Kindred Enterprises, LLC.

36. By paying his commission and bonus payments back to the Funders, Lowenthal violated applicable law: (i) by unlawfully splitting commissions with an unlicensed person, in violation of N.J. Stat. Ann. § 17:22A-41d; and (ii) by unlawfully rebating premium payments, in violation of N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

37. R.G. failed to make the second year's scheduled premium payment.

38. FGLIC sent a "Lapse Letter" on or about October 19, 2017, advising R.G. of the policy's impending lapse.

39. In the Lapse Letter, FGLIC asked R.G. to contact a FGLIC representative to discuss the policy.

40. A representative of FGLIC contacted R.G. on or about November 1, 2017, to inquire as to the reasons that R.G. would allow the policy to lapse with no value after paying over $900,000 in premiums during the first year.

41. R.G. said that she did not want the policy to lapse, and advised that she would contact Lowenthal.

42. Lowenthal called FGLIC's representative on November 9, 2017, and claimed that he would call again on November 27, 2017, to renew the policy.

43. R.G.'s policy was not renewed, nor did FGLIC receive further payment on the policy.

44. FGLIC sent R.G. a Rescission Letter on or about November 29, 2017.

45. Lowenthal's profit of the conspiracy was approximately $230,000 (the difference between the commission and the first year premium).

**D. Lowenthal Sold E.F. a FGLIC Policy as Part of the Scheme Using Funds from Dr. Aharon Gutterman**

46. Lowenthal sold E.F. a FGLIC life insurance policy valued at $5 million, which was procured by fraud and breaches of fiduciary duty.

47. In July 2016, Lowenthal completed a FGLIC life insurance application (the "E.F. Application") for E.F., which redacted Application is attached as Firestone Decl., Exhibit G and is incorporated herein by this reference.

48. The owner of the policy was to be the E.F. Trust 2016, which Lowenthal represented as being a New Jersey entity.

49. The E.F. Application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"

50. Lowenthal falsely answered this question "NO" in the Application.

51. On or about July 22, 2016, Lowenthal executed the E.F. Application, certifying falsely that E.F. was not using funds from a third party in order to pay the insurance premium.

52. Upon information and belief, Lowenthal knew this representation was false when made because he knew E.F. was paying the premium with funds from a Funder.

53. Lowenthal concealed from FGLIC the fact that E.F. was paying the premiums with funds from a Funder to induce FGLIC to issue the policy to E.F.

54. Upon information and belief, Lowenthal also fraudulently concealed from FGLIC the fact that the E.F. Application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the E.F. policy's first-year premium.

55. Lowenthal's false statements in connection with the E.F. Application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

56. Using the mail and wire, Lowenthal delivered the fraudulent application to FGLIC on or about July 22, 2016.

57. Unbeknownst to FGLIC, in late October or early November 2016, Dr. Aharon Gutterman loaned Lowenthal $862,000 for the purpose of purchasing life insurance policies as part of the Lowenthal Scheme.

58. Dr. Aharon Gutterman submitted a Proof of Claim in this bankruptcy proceeding, in which he attached the $862,000 promissory note. (ECF Claim 8-1 at p. 12 of 16.). The note is undated, but states that Lowenthal will repay Dr. Gutterman on November 7, 2016.

59. In reliance on Lowenthal's misrepresentations, FGLIC issued a life insurance policy to R.G. with a value of $5 million, and an effective date of November 28, 2016.

60. On January 2, 2017 and January 9, 2017, Lowenthal caused two premium payments totaling $800,550 to be wired to FGLIC to fund the first-year premium for the E.F. policy.

61. In reliance on Lowenthal's fraud, FGLIC paid Lowenthal, directly or indirectly, commissions and bonuses of approximately $950,000 for the fraudulent sale of the E.F. policy.

62. Upon information and belief, Lowenthal paid most of the commission and bonus payments back to the Funders to repay the sham loans that had funded the premiums.

63. By paying his commission and bonus payments back to the Funders, Lowenthal violated applicable law: (i) by unlawfully splitting commissions with an unlicensed person, in violation of N.J. Stat. Ann. § 17:22A-41d; and (ii) by unlawfully rebating premium payments, in violation of N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

64. E.F. failed to make the second year's scheduled premium payment on the policy.

65. FGLIC sent E.F. a "Lapse Letter" on or about January 4, 2018, advising of the policy's impending lapse.

66. In the Lapse Letter, FGLIC asked E.F. to contact a FGLIC representative to discuss the policy, including the reason that E.F. would allow the policy to lapse with no value after paying over $800,000 in premiums during the first year.

67. On or about January 18 and 19, 2018, a representative of FGLIC attempted to contact E.F. by telephone to discuss the policy, but received no response.

68. E.F.'s policy was not renewed, nor did FGLIC receive further payment on the policy.

69. FGLIC sent E.F. a Rescission Letter on or about February 26, 2018.

70. Lowenthal's profit of the conspiracy was approximately $150,000 (the difference between the commission and the first-year premium).

71. Lowenthal sold at least four other FGLIC policies with remarkably similar fact patterns.

72. Upon information and belief, these four policies were also part of the same conspiracy to defraud FGLIC.

73. Information for these four other policies is set forth in Firestone Decl., Exhibit B, which is incorporated herein by this reference.

**E. <u>Bankruptcy Case</u>**

74. On December 6, 2019 (the "<u>Petition Date</u>"), Lowenthal commenced this Chapter 11 Case by voluntarily filing a petition for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with this Court.

75. In accordance with this Court's *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 47], FGLIC timely filed a proof of claim asserting claims against Lowenthal in this Chapter 11 Case.

76. FGLIC asserts claims against Lowenthal in the amount of no less than **$4,485,110.70** for commissions that Lowenthal fraudulently induced FGLIC to pay Lowenthal for insurance policies that Lowenthal procured from FGLIC through fraud.

77. In addition to the foregoing, FGLIC asserts claims in the amount of no less than **$40,321,386.78** against Lowenthal for amounts Lowenthal and others fraudulently induced FGLIC to pay them, directly or indirectly, in commissions and bonuses for the issuance of insurance policies procured through fraud.

78. Accordingly, FGLIC is a creditor and a party in interest under the Bankruptcy Code.

79. On May 18, 2020, Lowenthal filed his *Motion to Convert Chapter 11 Case to Chapter 7 Case* (the "Motion to Convert") [Docket No. 64].

80. On June 9, 2020, Dr. Aharon Gutterman ("Dr. Gutterman"), one of the Funders, and the son of R.G., filed *Dr. Aharon Gutterman's (I) Objection to Debtor's Motion to Convert Case and (II) Cross-Motion for an Order Dismissing the Debtor's Case Pursuant to 11 U.S.C. §1112(b)* (the "Motion to Dismiss") [Docket No. 71].

81. Thereafter, Darren Singer, Rockford Holdings Group LLC, Steve Makowsky, and Joe "Yossi" Davidson, another set of Funders (together with Dr. Gutterman, the "Objecting Funders") filed their *Joinder to the (I) Objection to Debtor's Motion to Convert Case and (II) Cross-Motion for an Order Dismissing the Debtor's Case Pursuant to 11 U.S.C. §1112(b)* [Docket No. 77].

82. According to the Objecting Funders, this Court should deny the Motion to Convert, and instead dismiss Lowenthal's Chapter 11 case under section 1112(b) of the Bankruptcy Code, which provides, in pertinent part, that a court "shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this title, whichever is in the best interests of creditors and the estate, for cause."

83. FGLIC respectfully submits that this Court should not dismiss this bankruptcy case.

84. FGLIC further respectfully submits that, as requested by Lowenthal, this Court covert this Chapter 11 case to a Chapter 7 case.

85. FGLIC submits that such conversion is in the best interests of creditors and the estate. Justice requires the appointment of an independent fiduciary who can manage the claims of many creditors, marshal the assets located in several states for the benefit of all creditors, and determine whether the debtor is disqualified from discharge due to his fraudulent conduct or other statutory reasons. Otherwise, the victims and perpetrators of the fraud will likely file numerous competing actions in various jurisdictions, which will lead to inconsistent results, the dissipation of assets, and the waste of juridical resources.

## RELIEF REQUESTED AND BASIS THEREFOR

86. For the reasons set forth herein, this Court should maintain the bankruptcy case in this forum and convert the Chapter 11 case to a case under Chapter 7 because it is in the best interests of creditors and the estate.

87. FGLIC takes no position on whether Lowenthal has an absolute right to convert his case to Chapter 7. Instead, FGLIC submits that the conversion of this Chapter 11 case to Chapter 7 and the appointment of a trustee would be in the best interests of the creditors and the estate for two principal reasons.

### A. Justice Calls for the Appointment of a Trustee.

88. Upon conversion of this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, a trustee would be appointed to administer Lowenthal's assets, investigate Lowenthal's affairs, examine and object to proofs of claim, object to Lowenthal's discharge if

advisable, and monetize Lowenthal's assets, including any claims, and make distributions to creditors. *See* 11 U.S.C. § 704 (enumerating the duties of a trustee).

89. Given the extensive nature of Lowenthal's purported fraudulent conduct, the estate and its creditors would benefit from an investigation by an independent fiduciary, such as a trustee, who has the ability to pursue claims and "recover property for the estate through the avoidance of various types of transfer from the debtor or from the estate" for the benefit of all creditors. 6 COLLIER ON BANKRUPTCY ¶700.04 (16th ed.).

90. In particular, a trustee would generally have the exclusive right to pursue fraudulent transfer claims for the benefit of all of Lowenthal's creditors. *See, e.g., FDIC v. Hirsch (In re Colonial Realty Co.*), 980 F.2d 125, 137 (2d Cir. 1992) (holding that a fraudulent conveyance action brought by a creditor was stayed); *Romagosa v. Thomas (In re Van Diepan, P.A.*), 236 F. App'x. 498, 501–02 (11th Cir. 2007) (stating that trustee has sole authority to prosecute fraudulent conveyance action).

91. Under section 546 of the Bankruptcy Code, a trustee would have until the later of two years from the Petition Date or one year after the trustee's appointment or election if such appointment or election occurs less than two years after the Petition Date to commence an avoidance action. *See* 11 U.S.C. § 546(a).

92. If the period set forth in section 546 of the Bankruptcy Code expires or the Chapter 11 case is closed before the trustee brings a particular state law avoidance action, the right to bring such action reverts to individual creditors. *See Hatchett v. United States*, 330 F.3d 875, 886 (6th Cir. 2003) (holding that creditors could commence state law avoidance actions after the closure of a bankruptcy case).

93. Accordingly, the interests of the Objecting Funders will not be prejudiced if an independent fiduciary; i.e., a trustee, is allowed to marshal assets and investigate claims.

94. If the independent fiduciary is unable to accomplish that endeavor then the Objecting Funders will then have the right to pursue their clams.

95. This would certainly reduce out of pocket expense.

96. Here, FGLIC believes upon good information that Lowenthal may have, with the help of others, used certain funds, including commissions paid by FGLIC, to purchase the Real Property.

97. A trustee should be appointed to investigate the transactions involving the Real Property and, if possible, to recover the Real Property as fraudulent transfers for the benefit of all creditors.

98. Moreover, a trustee would benefit the estate and its creditors by limiting Lowenthal's exposure to certain unenforceable claims.

99. Under section 704 of the Bankruptcy Code, the trustee would be entrusted with the duty to review the proofs of claim filed by creditors, including the Funders, and to file objections to such claims if, among other things, they are unenforceable against Lowenthal under applicable nonbankruptcy law, such as New Jersey's anti-rebating statute, N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13. *See* 11 U.S.C. § 502(b)(1).

100. The disallowance of unenforceable claims would reduce Lowenthal's liability and presumably enhance the recoveries to the estate and the creditors.

101. Consequently, the conversion of the Chapter 11 Case and the appointment of a trustee would benefit the estate and its creditors.

**B. <u>The Automatic Stay and a Centralized Forum is Necessary To Protect Creditors and Preserve the Estate</u>.**

102. Moreover, if this Court converts the Chapter 11 Case to one under Chapter 7, creditors would retain the benefit of the automatic stay, which generally enjoins creditors from pursuing their remedies without further order of the court and tolls applicable statutues of limitations. *See* 11 U.S.C. §362(a).

103. It is well established that the automatic stay "is one of the fundamental debtor protections provided by the bankruptcy laws." H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977).

104. However, the automatic stay also protects creditors by preventing the piecemeal dismemberment of a debtor's estate to the detriment of creditors as whole.

105. Upon dismissal of the Chapter 11 Case, as advocated by the Objecting Funders, the automatic stay would be terminated. *See* 11 U.S.C. §362(c).

106. Absent the automatic stay, it is likely that the proverbial "race to the courthouse" will commence with creditors advocating their personal interests to the detriment of all creditors.

107. Indeed, Dr. Gutterman and others have already commenced litigation pursuing claims related to Lowenthal's fraudulent actions against Ricky Lowenthal, who is Lowenthal's wife, and Philip Herzog, who is Lowenthal's father-in-law, in the Eastern District of New York.

108. Moreover, FGLIC anticipates that certain parties, particularly the Objecting Funders, will upon termination of the automatic stay purportedly pursue claims in other courts with ulterior motives.

109. In particular, FGLIC suspects that such litigation outside of the supervision of this Court will be used by the Objecting Funders defensively against FGLIC.[8]

110. In objecting to the Motion to Convert, Dr. Gutterman relies on *In re Adler*, 329 BR. 406 (Bankr. S.D.N.Y. 2005) where the late Honorable Burton L. Lifland dismissed a debtor's chapter 11 case in the face of the debtor's motion to convert the case.

111. Like the debtor in *Adler*, Lowenthal may have sought relief under the Bankruptcy Code with improper motives.

112. However, unlike Adler, there are sound reasons for this Court to keep the case and convert it to one under Chapter 7.

113. In particular, unlike the debtor in *Adler*, Lowenthal and his estate appear to have meaningful claims, including fraudulent transfer claims, and interests in valuable property, including the Real Property, that should be administered for the benefit of all creditors. *See id.* (noting "if this case were converted, because the Debtor's sole asset has been liquidated there appears to be noting for a chapter 7 trustee to administer").

114. It would be premature for this Court to dismiss the Chapter 11 case and terminate the automatic stay until a trustee is able to investigate Lowenthal's affairs and pursue claims on behalf of Lowenthal's estate. *See id.* (noting "by dismissing the case, creditors will be able to avail themselves of their rights to collect from the Debtor").

---

[8] Interestingly, the Proofs of Claims and Adversary Complaints filed by the Objecting Funders are almost identical, even including identical typographical errors. *Compare, e.g., Alan Rubenstein v. Lowenthal, et al.*, at ¶ 31 (Doc. 46); *Darren Singer v. Lowenthal, et al.*, at ¶ 30, Case 20-06008-RDD (Doc. 1); *Rockford Holdings, et al. v. Lowenthal, et al.*, at ¶ 33, Case 20-06009-RDD (Doc. 1).

115. Lowenthal's case is akin to the situation faced by the United States Bankruptcy Court for the Middle District of Florida in the chapter 11 case of *In Re Blunt*, 236 B.R. 861 (Bankr. M.D. Fla. 1999).

116. There, the Court found that cause existed to dismiss the debtors' Chapter 11 case, finding, among other things, that the Debtors "lacked good faith in filing this Case, as evidenced by their intent to abuse the judicial process and the purposes of reorganization provisions of the Bankruptcy Code, and their intent to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Blunt*, 236 B.R. at 865.

117. Nevertheless, the Court converted the Chapter 11 case to Chapter 7, because the estate had a "potential asset" in a "cause of action against the City of Jacksonville," which should be administered by a trustee. *Id.* at 866.

118. Similarly, Lowenthal's estate has potential assets in the form of claims and interests in the Real Property that should be administered by a trustee.

119. Creditors and the estate would benefit by conversion of the Chapter 11 Case and the appointment of a trustee, who could investigate Lowenthal's affairs and take actions, including pursue fraudulent transfer claims, for the benefit of all creditors in a centralized forum: this Court.

WHEREFORE, for the reasons set forth herein, Fidelity & Guaranty Life Insurance Company respectfully requests that the Court (i) grant the Motion to Convert, (ii) deny the Motion to dismiss, and (iii) grant Fidelity & Guaranty Life Insurance Company such other and further relief as the Court may deem just and proper.

Dated: New York, New York
July 1, 2020

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

/s/ *Frank A. Taylor*
Frank A. Taylor
Francisco Vazquez
Julie H. Firestone, *admitted pro hac vice*
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: 212-318-3000
Telefax: 212 318-3400
*Attorneys for Fidelity & Guaranty Life Insurance Company*